Good morning, Your Honors. May it please the Court, my name is Troy Mueller, appearing on behalf of the Appellants, the Franchisee Dealers. May I ask you to speak up, please? Yes, of course, Your Honor. Sorry. The foremost reason that the Court should reverse the District Court's decision and find that Exxon's offers were not bona fide is the inclusion of a mandatory 15-year supply agreement to be entered into by the dealer at the expiration of the existing supply agreement. Doing so was a violation of the dealer's rights, it forced a substantial change in the franchise relationship, and it was contrary to the purposes of the California statute. Today I'm going to try to address two independent reasons for why the Court should reverse the District Court's decision. First, the Court should reverse because ExxonMobil included with its offers terms which were impermissible, either because those terms were unreasonable as a matter of law or because those terms were unconscionable. And alternatively, the Court can also reverse if it finds that ExxonMobil failed to convey the entire interest which it was required to convey under California Business and Professions Code, Section 20-999.25a. Do you agree with me that in reviewing whether an offer is bona fide or not, we should look at the entire offer, the entire package, both price and non-price terms? Because how can one judge the legitimacy of an offer by dissecting terms piece by piece? We've got to look at the relation to the whole, don't we? I think that's correct, Your Honor, and certainly the question of price can be a basis for finding that an offer is not bona fide. In this case, we're dealing with a summary judgment ruling that was limited to the non-price terms, so that's the issue that's before the Court. If the Court finds that either terms were included which could not be included or that there were interests which had to be conveyed which were not conveyed, that could also be a reason for these offers to be found not bona fide. But when you began with the 15-year term, and I would actually tend to agree with you that it was by far the most questionable, aren't you not using a sort of overall approach to the bona fide order by asking us to go one by one? Well, no, Your Honor. So if we look at the offer as its entirety, any piece which violates certain... Actually, let me... Suppose they had this 15-year term, but the price was really low, below market. It depends on how that 15-year term works. So if the Court looks at an existing 15-year supply agreement, then perhaps Your Honor's suggestion that a low price would be a reason why a court could find it to be bona fide. In this case, though, we're dealing with a new offer, a new supply agreement. And if I can briefly explain what I mean by this, Exxon doesn't have a 15-year supply agreement. It has a three-year supply agreement. And at the end of an existing supply agreement, franchise agreement, each franchisor, excuse me, any franchisee dealer like my clients has the ability to choose to enter into a new agreement or not. And that's the same whether they own the property or not, although the consequences of choosing not to sign a new one if they don't own the property. Exxon's expectation that when they don't own the property, that dealer will sign a new agreement so that they don't lose their business. So was it your position that having had a three-year and now proposing a 15-year is unreasonable as a matter of law? That's correct, Your Honor. And the reason it's unreasonable as a matter of law is because it takes away the dealer's right to choose to be bound or not be bound. And the Court can follow... That's true with a three-year agreement. Not if it's an existing... Well, actually, yes, Your Honor. So any future agreement would violate that rule. And it's the same rule that the Court adopted in the Graham case. In the Graham case, the Court found that an arbitration clause used to narrow a statute of limitations and to restrict the ability of the franchisee under the PMPA to seek attorney's fees and punitive damages could not be included because it was a waiver of the franchisee dealer's rights. And the same was actually held by the District Court on its holding in Coast Village on summary judgment, where the Court said that in that case, terms which limited damages, which also narrowed the statute of limitations, and which required the franchisee to waive claims on the existing agreement, were also impermissible. The Court would be following those precedents if it chose to find this term impermissible on the basis of a waiver of rights. But that's not the only way the Court can do it. The Court can also find it impermissible if it looks at this from the perspective of a change in the franchise relationship. So this was the holding of the Court in LMP, which is also a PMPA case. It was a District Court decision. But in that case, the Court looked at a very similar case to what we have here of a statutory offer conditioned upon the dealer agreeing to accept the supply agreement. And that Court said that you cannot do that. So the franchise relationship that was changed, that the Court found so improper in that case, was the same that's going on here, from franchisor owned and franchisor supplied to franchisee owned and franchisor supplied. So if the Court is not inclined to find that this is impermissible because it's a violative of the dealer's rights, or future rights rather, it could also find that it's a change in the relationship, and on that basis find it impermissible. I want to make clear, by the way, something that I think is kind of confusing in the briefs. The Court doesn't have to look at these as a question of reasonableness or unreasonableness. It can find, as a matter of law, that some terms simply can't be included because they undermine the purposes of the statute. That seems to be the approach of the Courts in L&P and Graham and Coast Village. So the Court doesn't have to do what the District Court found so onerous of going through term by term, although we certainly believe that the Court should do that, because the value in doing a term by term analysis is that it provides the franchisees flexibility, and the franchisors. So one thing that I think, again, did not bear out in the pleadings, which I would like to share with the Court, is that this is a statute, like the PMTA, which enables the Courts to look at a deal, given the innumerable numbers of circumstances and terms which may be offered or which may arise, and try to form something that does justice to the parties. Are you disagreeing with the District Court's approach here of adopting the 7th and 11th Circuit approach regarding the meaning of reasonableness under the PMTA? Are you okay with the general framework of the District Court? I'm not, Your Honor. So the unreasonableness analysis really needs to be looked at from two prongs. First of all, the unreasonableness analysis was actually a reasonableness analysis. So in both the Brach and Texaco cases, which are the cases that the District Court looked at, what the Court was doing was saying, what is reasonableness in this context, and defined it as unconscionability. And one of the reasons that made sense for that Court, but not for us, is because in that case, they were dealing with existing terms, terms which had already been agreed to by the parties. Now we know from... So was any change unreasonable? I'm sorry, Your Honor? Any change in the existing framework, would that be unreasonable? No. Any change in the franchise relationship, which is a fundamental one, would be unreasonable. Well, if the purpose behind the California statute was to allow a franchisee to continue doing business, there's nothing in these offers that precludes them from continuing to operate as gas stations, and wasn't that one of the concerns in the legislation? No, Your Honor. So... Well, actually, let me rephrase that. It is something that the legislature was concerned with. Yes, but... So, and again, there are two ways to approach this... The sole purpose, but a significant purpose. Right, but if it's not the sole purpose, then other purposes can be served where the franchisees are permitted to continue in business. And so, or by restricting terms, which nevertheless allow franchisees to continue in business. What do we do with the fact that apparently 36 of these franchisees accepted the offer, and only five of the original plaintiffs in this case have appealed the district court decision? It appears to me they're okay with the deal they got. It's irrelevant, Your Honor, because each of those stations, first of all, were different stations, they're not the same, and secondly, they were accepted under the same kind of terms and conditions which we're dealing with here, where there is extreme franchisee power influencing the purchase of these terms. Unlike a right of first refusal, and the terms included in those offers, where it's open to market participants who may choose to not do the deal at all. Franchisees, any franchisee who is looking at an offer like this, is faced with very harsh consequences if they don't accept. And in fact, it may be their only chance to purchase these properties. So, you can't look at those terms from different sites, though they may be terms similar to these, because they're not the product of open market transactions. They don't bear what the market would actually hold for those terms. And I want to make sure I have enough time to respond to the court's questions to my opponent. So, unless there are other pressing questions, I want to reserve the rest of my time for rebuttal. Fine, thank you very much. Thank you, Your Honors. Yes, sir. May it please the court, Doug Strauss, Archer Norris, on behalf of Circle Case Stores Inc. I'm joined by Robin Wofford from the Wilson Turner Cosmo on behalf of Exxon. And I think that we're missing a fundamental and key point here, which is that the dealers have an option in the offers that they received. One option they have is to decline the offers, in which case they continue to be franchisees and continue to have the franchise relationship that they've always had. That's an important fact to understand. In this instance, I gather it would be up fairly soon, but then they'd be protected by the federal statute? Correct. If the dealer says no thank you to the bona fide offer, the dealer continues to have the franchise rights of any PMPA dealer, which means they have a right to be renewed absent good cause for franchise termination. So it's a false comparison to compare the 15-year supply agreement that they must accept as part of a purchase with the three-year supply agreement that they currently have and likely have to accept in perpetuity to remain a franchisee without ownership rights. So actually, in trying to compare the two packages as a whole, one would have to look at the fact that after 15 years under the bona fide offer, the dealer would be a free agent, and the dealer could then negotiate a franchise with any franchisor of his or her choice, or could actually exit the marketplace for fuel entirely and develop the property to a higher and better use, albeit a commercial use and not a residential use. So suggesting that the dealer is without recourse and only has this option, which is to purchase the property on these supposedly harsh terms, there's no evidence to support the notion that they're harsh terms, but assuming hypothetically that they were harsh terms, the dealer is not without options. The dealer can remain exactly as the dealer is now. That's the key distinction between the situation before this court and the LMP district court. For example, in LMP, the dealer is told, we're exiting the franchise business, and if you don't take this deal for a supply agreement, you are out of business. That's not the choice that's presented to the five dealers that are complaining here. And in that case, the trial court actually said there's nothing inherently wrong with a supply agreement. It's simply a situation where, when the alternative to accepting the supply agreement is you lose your business entirely, that is an unreasonable change in the relationship. We're actually not forcing any change in the relationship upon these dealers. We're giving them an opportunity to purchase their properties. And... If they hang with you for another 12 years. 15, actually. Total. Well, no, because the 15 is added on top of the three. So while I'd like to agree it's 12, it really is 15. But of course, if they don't accept this option, if they want to stay in the oil business as a retailer, they have to hang with the franchisor in perpetuity for a longer period of time than 15 years, Your Honor. So it may be that it's only three-year contracts at a time, but it could be 10, 20, or 30 of them. And many of these franchisees have been franchisees for a long time. So they have a fork in the road. They can garner more control over their property and more control over the franchise relationship. It takes them time to do it. Or they can stick with the status quo. There's no evidence in this record that that is an unreasonable approach to the bona fide offer process. And one of the interesting facts is that there is no claim that the price being offered for the stations is unreasonable. The price has to approach fair market value. There's no claim before this court that there's an unreasonable price for the package of rights that are being sold. There's also no claim that the property interests that are being offered are inadequate to allow the retailer to continue to retail fuel products. So the two questions that the courts ask in a bona fide offer context, according to the 49er case, are both satisfied affirmatively without any dispute in the record before this court and without any dispute in the record before Judge Anderson in the trial court. The price is okay, and everything that you need to run a gas station is here. So there really isn't any further level of detail that we need to go to. Judge Anderson, in an abundance of caution, said, well, I will also apply an unconscionability analysis. And the reason that he picked that standard is, of course, going back to the 49er case and the PMPA cases, there's a constitutional issue here as to exactly how far the courts can go in interfering with the property rights of the franchisor to sell the real estate and to sell the franchise relationship. And in the particular instance of a California statutory sale, I'm reluctant to have to say 2099.25 too many times, so I'm going to revert to the California statute. But in the instance of a California statutory sale, it's an inherently understood portion of the arrangement that the franchise relationship will continue. And therefore, what is the franchisor doing? The franchisor is selling the franchise relationship to a new franchisor. And if you listen carefully and read carefully what's presented by appellants, their effort is to prevent the franchisor from garnering the value of that franchise relationship. Because their argument, essentially, is it's inherently unreasonable for the franchisor to offer any assurance to the new franchisor that the franchise relationship will continue for any length of time beyond the current franchise. And for the courts to say, that's right, would be an unconstitutional taking of the franchise rights of the existing franchisor, in this case, Exxon, which is selling to my client, Circle K. So the courts take a very minimal approach to reviewing these sorts of arrangements. No court has ever reviewed these matters on a term-by-term basis. 49er cautions against micromanaging, I think, is the word that's used in that case. And Judge Anderson followed that prudently and said, I'm going to use the same test that we use under the PMPA. I'm going to look and see whether these are unconscionable terms. And unconscionability presents a question of law, which allows the court to serve as a gatekeeper and avoid having a trial on the merits every time a dealer doesn't like one sentence or five sentences in the offer presented to the dealer under the California statute. And Judge Anderson says, if a term is arbitrary or outrageous, or using other words from the PMP cases, then I'm going to find that it's not appropriate. And then he says, in trying to figure this out, I'm going to take notice of the fact that there are 36 out of the 41 dealers that we're looking at who have accepted these exact terms. Can I just ask you whether it would be somewhat helpful to me to go back to the actual language of the statute? Yes, Your Honor. 2099.258. And it is a little murky because it says that in the case of least marketing premises, that is a strange term to me. I don't know whether you have any sort of term of art history to offer us on it, but it's an odd word, right? And I gather that your argument, your statutory language argument, largely hinges on that language. Is that right? Because otherwise, one would think that you're supposed to sell the franchisor's interest in the premises. If you thought what you were talking about was the traditional property fee interest, then all of these conditions might be problematical. I think you are correct that if the statute had said that the franchisor must sell the franchisor's entire fee interest in the real property and personal property associated with the service station, then it might be the case that additional assets needed to be included in the sale, then were included here. I also think, frankly, the 49er would have found that version of the statute to be an unconstitutional taking. But I think that the statute does not use that language. Oh, it actually does use it. Well, interest in the premises. I guess the question is, what's the premises? And the premises, Your Honor. It's not the physical place. Sorry, I didn't mean to interrupt you, and I certainly didn't mean to do so twice. I thought you were at a stopping point. The premises means, as you pointed out, the leased marketing premises. And that's actually a defined term under section 20999 parens I. We're saved from any decimal points in additional numbers. 2099 I, sorry, three nines, identifies leased marketing premises as the marketing premises owned, leased, or in any way controlled by a franchisor in which the franchisee is authorized or permitted under the franchise to employ in connection with the sale, consignment, and distribution of fuel. It's not the clearest definition that the California legislature has ever written. It's also not the most obtuse. What I think is most important for our purposes is that it's different than the entirety of the franchisor's interest in the property. If that was what the legislature had intended to say, it could have done so quite easily. The 49er case, which wrestled with this language a little bit, talks about it, and I think it's on page 1282 of the 49er decision. And it says essentially that section marketing premises means premises which are to be employed by the franchisee in connection with the sale, consignment, or distribution of fuel. Thus, a bona fide offer includes the sale of pumps, dispensers, storage tanks, piping, and other equipment necessary for the continued operation of a service station. So I think your honor is correct to say, what does it say in the statute in terms of what is the obligation of the franchisor to convey? But you don't mean, you can't mean, that it's only the sort of non-real property that we're talking about. It encompasses Suncom's concept of real property, right? Yes, your honor. It encompasses the concept that the real property interest necessary to operate the fuel station need to be conveyed. The balance that struck is the real property related interest, and I'm not positive whether it's a real property interest or not, but it shows up as restrictions on the use of the property. The real property interest that's necessary to garner the value of the franchise, i.e. the property interest that Exxon needs to sell to Circle K in order to continue to be a franchisor, that property interest is not transferred to the franchisee. So in essence, the supply rights which the franchisee does not currently have and which the franchisor does have and which the franchisor will continue to have under 2099.25, the supply rights do not have to be transferred and in fact cannot be transferred to the franchisee. If the supply rights were transferred, we would have a PMPA situation rather than a California statutory situation. So I've wrestled with it a lot. I understand why the language is challenging, but the interpretation that says that the franchisor has nothing to give to the next franchisor renders the statute irrelevant  of the franchisor's rights. So again, that takes us back to what is the proper role of the court in this situation and with all due respect to this court and Judge Anderson's court, the proper role is a relatively modest scrutiny to make sure that the price, and this is key, to make sure that the price approaches fair market value and that the assets that are transferred, real and personal, are sufficient to allow the retailer to continue to retail fuel products. And there's no dispute on either of those two points before this court. And we do have a vast majority of the 41 dealers that we know about who accepted these exact terms and conditions or actually potentially inferior ones because this is actually the third go-round of offers that were made to dealers and the two earlier ones weren't as good for the dealers as this particular offer. They started with a 99-year residential use restriction that was reduced to 20. Some of the dealers accepted that earlier offer. I'm not trying to argue that that's a material difference necessarily, but my point is that most of the dealers accepted these terms. And if we're trying to figure out in sort of a shorthand non-intrusive gatekeeper way, is this an okay deal? Is this a bona fide offer to have made to these dealers? The fact that 36 out of 41 took it and the fact that the price is not in dispute and the fact that you have everything you need to operate a gas station offered to the dealers is dispositive. So Judge Anderson got it right with all due respect. Okay, thank you very much. Thank you. Yes, sir. I want to quickly address a couple of the, I think, easier points to rebut. And that is first that we are not arguing that Circle K cannot sell or that ExxonMobil cannot sell its existing three-year franchise agreement or whatever's left of it or assign it. They're able to do that. What I understand the argument to be is that if your clients remain as lessees, as a functional matter, if they sell the franchise, Circle K would have perpetuity essentially because your clients would be in a very bad situation if they didn't continue the franchise. So therefore, if they're going to sell it instead of leasing it, they, to provide a time-limited guarantee of the franchise is not substantially, is essentially necessary in order to sell the franchise in the first place. They can, I think I understand your question, but if I didn't, correct me. What we're saying is they can't sell future rights. I understand why they want to assure Circle K of some continuing franchise relationship. Well, the question is why can't they? They cannot because it's not something they own. It's something the dealers own. The dealers have the right, just like anybody, to choose to be bound or not to be bound. And when they take that right and sell that future right to Circle K, what they're doing is they're selling something which the dealers own and not compensating the dealers for it. That's why it's problematic. Again, we're not taking their existing rights. Their existing contract rights, they are able to sell and we're not contesting that. So we're left with whatever's left of the supply agreement or the franchise agreement when we purchase if we purchase. But what they can't do is lock us in down the line. And it doesn't matter that in 15 years we could be free agents. We should be able to be free agents now because that's a right we have now. So they can't sell that away from us. The argument about the continuing business, if there was any part of this contract which prevented us from continuing business, it would be a PMPA case. And if that's the holding of the court, what the court is doing is saying there will be no scrutiny of any terms because any term which would be subject to scrutiny would be a PMPA term. So the only thing that the California statute would do is be an analysis of price. And I think that's contrary to the purpose of the California statute. 49ers said that the terms must be reasonable. And so we must give some understanding of what those terms are, what terms may be included in a context where it is assumed that there will not be an end to this business. Because if there were, again, it would be a PMPA case. With respect to the continued- Why does that matter exactly? If it were a PMPA case, it would be back to the same analysis anyway. Well, and I want to talk about that, Your Honor. So you're correct. We would follow PMPA case law. But PMPA case law actually is not as narrow as some of the cases that have used that continuing-use argument anyway. The cases cited by my opponent are district court decisions, Anand and Caputo, both relying on Ellis. Ellis was a case that dealt with a price issue. And the holding of that case was that- Well, separate from the price issue, one of the rules that that court set out was that the franchisees cannot be forced to purchase the goodwill because it's theirs. The court did make some statements in that case, relying on two previous PMPA cases. And this is where the danger of going off the rails is. Those cases were Roberts and Tobias. In Roberts, the court said that you could not include an offer- Or you could not have an offer that did not include the underground storage tanks, pumps, and lines, because that would not allow them to continue business. But one cannot extrapolate from that that that is the only thing that must be continued, right? The fact that they have to make those- have conditions which permit the sale of those items does not mean that they need not permit- not include any other restrictive means. And so that holding is really a misunderstanding of what the Roberts court intended to do. With respect to lease marketing premises, I heard your Honor's comment about that. This is a definition which identifies property. It does not parse rights in that property. And the term lease marketing premises is a term of art. It's included in the lease, which the court has a copy of in the record on page 906. And it says the marketing premises is- and then it gives the address. What that should tell the court is we're talking about the property. And I see my time is up. If the court doesn't have more questions, I'll sit down. Thank you very much. Thank both of you for really extremely competent arguments and interesting and complicated cases. Thank you, Your Honors. And we will submit Dory v. ExxonMobil Corporation, and we will take a short break.
judges: Gould, Berzon, Zouhary